

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00141-CV

IN THE INTEREST OF H.N.H.;
J.L.H., JR.; AND J.N.H., THE
CHILDREN

----------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Mother appeals the trial court's judgment terminating her parental rights to H.N.H.; J.L.H., Jr.; and J.N.H. In nine points, Mother challenges the legal sufficiency of the findings under Texas Family Code section 161.001(1)(D), (E), and (O) to support the termination of her parental rights to each of her three children. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father are the parents of H.N.H.; J.L.H., Jr.; and J.N.H. The children's home life was somewhat convoluted: Mother and the children lived with Father and his significant other Kimberly, along with the children that Father fathered with Kimberly. The three adults exposed the children to homes that were dirty and had unsafe living conditions, including domestic violence, which led to the removal of the children. The following factual background documents what the children endured before their removal, how Mother fared on her service plan after her children were removed, and the reasons why recommendations were made to terminate Mother's parental rights to her children.

### A. H.N.H.'s Health Issues

#### 1. Lice

Claire Nieswiadomy testified that while she was the school nurse at Evers Park Elementary, she saw H.N.H. in her office frequently over a two-year period beginning in September 2008. Nieswiadomy agreed that H.N.H. had missed approximately twenty-four days of school one year and twenty-one days of school the following year and that most of those absences were due to her chronic infestations of head lice. Nieswiadomy testified that H.N.H. came to school with head lice almost daily for two years and that this was the first time in her career that she had seen a child keep a head lice infestation for two years.

Nieswiadomy went over with Mother "many, many times" why lice was a problem and how to correct the problem. Nieswiadomy estimated that she went over the instructions with Mother sometimes weekly and sometimes every day and that she had talked to Mother about removing lice thirty or forty times. Because Nieswiadomy was aware from her conversations with Mother that

Mother had an impediment to learning, Nieswiadomy told Mother how to treat the lice "very, very simply and very, very clearly and repeatedly and gave the directions to her verbally." Nieswiadomy gave Mother combs and demonstrated how to use them, supplying her with oral and written instructions. Nieswiadomy always rechecked H.N.H. when she came back to school after Mother had treated her head; sometimes H.N.H. came with the active medication still in her hair, and other times she came with solutions on her hair that Nieswiadomy could not identify. Nieswiadomy treated H.N.H. in the nurse's office "a lot of times" in an effort to keep her in the classroom; Nieswiadomy testified that H.N.H. would have missed more school if not for Nieswiadomy's efforts.

Nieswiadomy said that most parents solved a lice problem in a couple of days, but Mother did not. Nieswiadomy testified that Mother had put into practice her advice only "[v]ery minimally."[2] Nieswiadomy said that Mother's burden to care for her children was not alleviated because of her possible learning disability.

Nieswiadomy opined that it was not a good parenting practice to allow a child to stay infested with head lice and that it could be emotionally or physically damaging for a child to have chronic infestations of head lice. Nieswiadomy thought H.N.H. would not have a normal childhood because her peers and teachers did not look at her the same way as other children. Nieswiadomy said that the lice infestation would subject H.N.H. to ridicule, which Nieswiadomy opined would have a lifelong impact.

---

[2]The record includes petitioner's exhibits 3, 4, and 5 showing that Mother took the children to Dr. Nuby to obtain lice treatment and that he was unable to eradicate the problem.

3

## 2.  Stomach Issues and Asthma

Nieswiadomy testified that H.N.H. had chronic stomachaches and that she had battled problems with hunger and constipation, which probably contributed to her stomachaches. H.N.H. would "very frequently" tell Nieswiadomy that she was hungry but would eat only a cracker. Nieswiadomy said that H.N.H. "did not really like normal food very much."

Nieswiadomy recalled that Mother said that she did not get up in time to feed H.N.H. and that she frequently brought H.N.H. to school late. On one occasion, Mother brought H.N.H. to school and said that she needed to eat, but the school cafeteria was already closed. Nieswiadomy testified that it was harmful for a child's emotional and physical development to not feed her breakfast and that a kindergartner needed to eat breakfast because she was growing and needed nutrition on a regular basis. Nieswiadomy agreed that this had occurred for two years.

Nieswiadomy testified that H.N.H. had chronic respiratory problems and that her asthma was not being properly treated. Nieswiadomy talked to Mother about how to treat H.N.H.'s asthma, and Mother responded that she was taking care of it. Nieswiadomy recalled that it took her quite a while to get asthma medication at school and that she had to call H.N.H.'s doctor to get the medication.

## 3.  Hygiene Issues

Nieswiadomy said that H.N.H. "very frequently" came to school dirty:  she had a dirty face (covered with mud and dried mucous), dirty hands, dirty arms, dirty legs, and filth and grime under her fingernails and toenails; her clothes were typically dirty; and her hair was dirty. Nieswiadomy said that H.N.H.'s hygiene

4

was "very poor." Nieswiadomy discussed H.N.H.'s hygiene with Mother, and sometimes H.N.H. came to school "a little bit cleaner" afterwards, but "it was never a regular thing that she was clean."

## B. H.N.H. Receives Burns

Stephanie Kolb, an investigator for CPS, received a referral in December 2008 because H.N.H. had received burns to her legs and her hand from a space heater. After Kolb investigated, she ruled the case "reason to believe" for medical neglect due to the delay before Mother sought medical care for H.N.H., "reason to believe" for physical neglect due to the conditions of the home, and "reason to believe" for neglectful supervision because Mother knew that the heaters in her home were hot to the touch and still allowed the children to be around them.

With regard to the medical neglect, H.N.H. received the burns around 10:30 a.m. when one of the children pushed H.N.H. into the heater while Mother was present. A family member called for a welfare check on the home around 2:00 p.m. after hearing about the burns. When police responded to the home, they immediately called EMS. H.N.H. would not provide detailed information, so the Department of Family and Protective Services[3] had to rely on Mother's explanation of the burns. The Department questioned the validity of Mother's explanation—that one of the younger children in the home (age two or three) had pushed H.N.H. (age six) into the heater. To the Department, the injuries did not equate to H.N.H.'s having been pushed into the heater because she had injuries

---

[3]We refer to the Texas Department of Family and Protective Services interchangeably as "the Department" and "CPS."

5

to her inner leg, outer leg, and palm.  One CPS worker said that "even to this day, I still wonder how that happened because it's almost like she had to straddle it when she fell and then it hit her on the other side."  H.N.H.'s burns were second-degree burns, requiring an overnight hospital stay.  Kolb agreed that the four-hour delay in receiving treatment for second-degree burns to a small child was "pretty significant."[4]

With regard to the "reason to believe" for physical neglect, Kolb testified that a water heater had broken two or three days prior to her visit and that the floors were still wet and "completely black from mud."  Kolb said that roaches were crawling on every wall, that there was rotten food in the kitchen, and that the environment was not safe for small children.

Kolb sent the family, including Father and Kimberly who were living in the home, to Family-Based Safety Services (FBSS) at the conclusion of the investigation.

Julissa Rodriguez, the FBSS caseworker assigned to Mother's case, testified that both families participated in services and that Mother was asked to participate in homemaker services and was given a referral to MHMR. Rodriguez went to Mother's home and talked to her about the concerns that led to the case being opened on her.  Rodriguez talked to Mother about parenting tips, health and safety hazards inside the home, cleaning the home, and dealing with lice.  Rodriguez provided Mother with a lice removal kit and talked to her about putting sheets in the dryer to kill the lice and about cleaning the children

---

[4]Kolb was aware that Mother had called some relatives and had attempted to treat H.N.H.'s burns with mayonnaise and possibly margarine and Neosporin, but Kolb testified that the burns were "very severe."

6

and making sure that their scalps did not have eggs or nits. Rodriguez observed that whenever she went to the home, the children had "things" on their faces, and Rodriguez talked to Mother about washing and hygiene issues. Rodriguez could not recall whether she ever saw the children when they were not dirty. Every time that Rodriguez pointed out to Mother that the children were not clean, Mother had an excuse—i.e., that they were eating, that she was "fixing to" clean them, or that they had just finished eating.

Mother completed the services and was discharged from FBSS in May 2009.

### C.      Injury to Another Child in Household

#### 1.      Supervisor's Testimony

Stephanie Lopez, a supervisor in the investigative section of CPS, testified that CPS received a referral that the children had lice and that one of Kimberly's children had sustained "some pretty significant injuries." It was unknown who had inflicted the injuries on Kimberly's child, so there was a subsequent referral on Mother and her children. Lopez and Ashley Hambrick investigated the referral on April 12, 2010.

Lopez interviewed one of Mother's children who had lice and found that "the lice was extremely active. You didn't have to be close up. You could see it crawling in his hair." Lopez discussed the lice problem with Mother, and Mother said that she had been treating the lice. Lopez asked Mother to show her the lice medication, but Mother could not locate it.

With regard to the injuries on Kimberly's child's face, Mother said that she had no idea how the injuries had occurred. Mother later said that Kimberly's child had received the scratch on her face when she ran into the corner of the

7

television. However, Mother's son J.L.H., Jr. said that Kimberly's child had misbehaved and had received the injury when Mother took a toy truck that had a broken light on it and hit her with it. With regard to a bite mark and bruise on Kimberly's child's shoulder, Mother admitted that one of her children had caused it. Lopez explained to Mother why a two- to three-week-old injury that still had bruising concerned the Department, and Mother had no response.

Lopez talked to Mother about disciplining the children, and Mother said that she had watched Kimberly's children and that she had disciplined them as well as her own children with a belt. Mother did not mention when, where, or how often she used a belt to spank the children.[5]

J.L.H., Jr. also mentioned to Lopez that Father and Mother fought by throwing things at each other and by hitting. J.L.H., Jr. said that Father had tried to hit Mother, but she had moved out of the way and had ended up with only a scratch. J.L.H., Jr. also told Lopez that Father and Kimberly had fought. Lopez testified that the domestic violence in the home concerned the Department because it creates the risk of emotional or physical abuse of the children and because the children could be injured when the adults throw objects.

Lopez told Mother that Kimberly could not live with Mother and her family. Lopez testified that if Father, Kimberly, and Mother were still living together in late November or early December 2010, that would be inconsistent with good emotional and physical health of the children.

---

[5]Lopez made clear that she was not saying that Mother's spankings of the children caused the injuries.

Lopez summarized the Department's concerns as follows: Mother had a previous case—the referral for H.N.H.'s burns—in which she had worked in-home services; Mother was now involved in a new case with concerns of domestic violence; and a small child had received injuries, with no explanation, on a vital part of her body. CPS was concerned about whether the injuries were received during a fight between the adults or whether one of the adults had inflicted the injuries on the child. Based on the fact that Kimberly's child exhibited injuries and that the cause of those injuries could not be determined, the Department felt that there was a sufficient risk to the children's safety and well-being and that they needed to seek the trial court's permission to remove the children. Lopez thus submitted an affidavit to the trial court for removal of the children.

### 2. Investigator's Testimony

Ashley Hambrick, an investigator for CPS, testified that she was also involved in the investigation on April 12, 2010. Hambrick went to the school to talk to H.N.H., who was seven at the time. H.N.H. said that sometimes Father slept in the room with Mother and that sometimes he slept in the room with Kimberly. H.N.H. told Hambrick that nothing happened when she got in trouble at home but that Kimberly was mean to her children. H.N.H. also told Hambrick that one of Kimberly's children had a bite mark on her but did not know how she had received the bite. H.N.H. said that Mother sometimes spanked Kimberly's children with a belt.

Hambrick learned that Kimberly and Mother took turns watching each other's children, so there was no way to determine who caused the injuries to the

9

child. One child of Kimberly's had a cut on her face and some bruises on her back, and neither Mother nor Kimberly provided an explanation for the injuries.

Hambrick made a referral to the District Attorney's Office because there was a risk of physical abuse to the children and because there were unexplained injuries on Kimberly's children. Additionally, Mother had worked FBSS previously, and there was a concern regarding Mother's lack of protectiveness of her children. Hambrick testified that she did not remove the children at that time, but she submitted affidavits to the trial court.

### D. CPS Removes Children

Mother's children were ultimately removed on April 14, 2010, due to concerns of physical neglect and medical neglect. The physical neglect was related to the concern that Kimberly's injured child, who lived in the same home as Mother's children, was injured by someone in the home. There was a moderate level of concern, not the most severe, based on the fact that no one could explain how the child had received her injuries.[6]

### E. Perspectives Given at Trial

#### 1. CPS Caseworker's Perspective

##### a. Services

Dea Davis, Mother's CPS caseworker, testified that when the new case was opened in April 2010, the services that were offered to Mother included a psychological evaluation, in-home homemaker trainer services, healthy relationships classes, and anger management classes. Davis later extended Mother's services beyond those originally set up because CPS "wanted to make

---

[6]Kimberly later admitted that she had injured her child.

10

sure that [they] offered her all the services possible to help reassure the safety of her children if they were returned home to her. And it had been requested by the parent trainer, but also with some reservations of she wasn't sure whether [Mother] would actually benefit from the additional time."

Mother completed the homemaker training class, but the trainer was concerned that there were times during the course when Mother stopped making progress in that the house was not as clean or as well-kept as it had been previously. Mother successfully completed the anger management classes. Mother did not complete counseling with Dr. Greer because Dr. Greer terminated the counseling sessions. Other individual counseling sessions were offered with Mark Dittloff to help Mother deal with the stress of having a CPS case and with her children, and Mother attended most of those sessions.

### b. GED Program and Literary Class

The services CPS offered to Mother during the course of the case, including a GED program, were intended to help Mother establish her independence. They were encouraged so that Mother could develop a "job skill" and move forward with DARS, which helped people locate employment. DARS referred Mother to Denton ISD, but Mother did not follow through at that time. In January, Davis reinitiated the idea of Mother's obtaining her GED and had found a literacy program that Davis thought would benefit Mother.[7] Mother was eager to participate in the GED program but was hesitant about the literacy program, stating that she knew how to read and therefore did not need to take the literacy program.

---

[7]The GED course and a literacy class were not ordered by the court.

11

### c.     Employment and Income

Davis had no knowledge of Mother ever holding a job.    With no employment history, the Department was not very confident that Mother could support her children, even though Mother was part of the Home and Community-Based Services, which Davis testified could help Mother find other resources in terms of job skills like cleaning homes.   The Department was thus concerned that if the children were returned to Mother, she would not have the income to provide her children with all the necessities and to continue to pay for her home.   But Davis testified that Mother received SSI and that her children might possibly be eligible for SSI, which could provide additional income for the family.

### d.     Visits

Mother was timely to her visits, but she missed several because Father had encountered car problems.   He was the sole provider of her transportation to the visits.    Mother was appropriate during the visits, and the children were affectionate toward Mother.   At the last visit prior to the termination trial, Davis noticed that H.N.H. gravitated more toward the foster father than Mother, but that was Davis's only concern during all of the visits.[8]

### e.     Stability of Housing

Throughout the case, CPS was concerned about the stability of Mother's housing—because she had lived at four residences while the case was open— and her relationships—because of the unstable relationship between Mother, Kimberly, and Father.   Davis testified that CPS had set as one of its goals for

---

[8]Davis had visited the children in their current placement, and they were doing well.   All three children received play therapy, and H.N.H. and J.L.H., Jr. received speech therapy.

Mother to establish a consistent residence for at least six months, but Mother never accomplished that. Mother had resided on South Wood Street for approximately two months[9] at the time of the trial, which did not allow for adequate time to review whether Mother could maintain a safe home for the children. It was the first time that Mother had lived in a home without Father and Kimberly. Davis had visited Mother's home on Wood Street and had found it to be suitable and appropriate; Mother had acquired the furniture and necessities for the children.

### f. Domestic Violence

Davis was not personally aware of domestic violence in the home, other than the statements in the affidavit regarding what J.L.H., Jr. told a caseworker. J.L.H., Jr. reported witnessing violence in the home between the adults.[10] An incident in the home on August 12, 2010, resulted in broken windows. The domestic violence caused concern for the best interest of the children.

Davis had no concerns about whether Mother loved her children. Davis was concerned, instead, about the stability in Mother's housing and her continued relationship with Father and Kimberly. When asked about the specific concerns that she had about that relationship between the three adults, Davis said,

---

[9]In various places, the record states that Mother was in her home either three weeks or three months at the time of the trial. However, the testimony reveals that Mother's lease started on February 8 and that she moved in on February 15, 2011. The termination trial was on April 11, 2011. So Mother had been in her home for two months at the time of the termination trial.

[10]CPS was also concerned that Mother's young children had knowledge that Father rotated between Mother and Kimberly; thus, CPS did not approve of the sexual relationships that had been taking place.

13

It goes back to the beginning, when the initial referral came in and the decision to remove, that there was physical abuse in the home, and that either [Mother] or [Kimberly] would be possibly the perpetrator. So they were asked to split up at that point. And the concerns would be that her children would be in the home with someone that was physically abusive, as well.

Davis did not think that Mother had the protective nature required to protect her children from further abuse; Davis thought that Mother would continue to choose her friendship and relationship over the safety of her children.[11] Moreover, Davis did not believe that Mother was an independent thinker because she had looked to her attorney for answers during the permanency conference and because the parenting homemaker had expressed concerns over Mother's ability to think for herself.

### g.    CPS's Goals

At the outset of the case, CPS's goal was family reunification. The goal changed to termination at the permanency hearing in September 2010 because the Department determined that Father and Kimberly were not making the progress that the Department wanted to see and that Mother would continue the relationship with them even if their parental rights were terminated.[12] CPS was not willing to return the children if Mother was living with Father and Kimberly.

---

[11]Davis, however, agreed that it was possible that Mother might stay away from Father and Kimberly if the children were returned to Mother.

[12]In September 2010, Davis had evidence of a continued relationship between Mother and Father. Despite Mother's knowledge that removal was the goal of CPS, she continued to make contact on many occasions with Father and Kimberly. Davis testified that one of her coworkers, Veronica Tackett, saw Mother, Father, and Kimberly together at an AT&T store on February 8, 2011, despite Mother's having been encouraged to stay away from Father and Kimberly.

### h.    Department's Recommendation

The Department was of the opinion that it was in the children's best interest to terminate Mother's parental rights because of Mother's actions and inactions, specifically her past history with CPS, her continued relationship with Father and Kimberly, her continued attraction to Father, her inability to act independently of Father's approval, her failure to protect her children, her failure to maintain stable housing for six months, and her failure to gain independence so that she could support her children if they were returned to her.

### 2.    Psychologist's Perspective[13]

Mark Foster, a psychologist, testified that he met with Mother in May 2010 and conducted a psychological evaluation on her. Mother's intellectual abilities fell in the mild mental retardation range with an IQ of sixty-five.[14] Mother's performance IQ was seventy-five. Foster had mild concerns that Mother had tested lower than her actual IQ due to her emotional functioning and personality factors, and he believed that Mother's actual IQ might be "a little bit higher, but it's not going to be significantly higher."

Foster testified that a person with an IQ similar to Mother's might be able to benefit from services but probably would not benefit significantly; it depended

---

[13]Although the Department did not move to terminate Mother's parental rights based on mental illness, *see* Tex. Family Code Ann. § 161.003(a) (West 2010), we include the psychologist's testimony because it is relevant to the endangering conduct finding.

[14]Foster explained that "IQ" refers to how fast a person learns and said that some people never get to more advanced, abstract thought processes. Foster did not make a diagnosis of mild mental retardation because that diagnosis cannot be made solely by an IQ score; he said only that Mother's IQ score fell in that range.

on the individual.  When asked whether a person with an IQ of sixty-five and a performance IQ of seventy-five could complete services, Foster said that it would depend on whether the services were presented at her level and the level of her motivation.  Foster opined that it would be very difficult for Mother to successfully complete the services offered to her due to her mental abilities.  Foster, however, testified that Mother's IQ seemed to indicate that there may be meaningful changes in her behavior but that it would be considerably slower than most people, but Foster agreed that indicated that Mother could change.

Foster testified that

[a]n IQ of 65 has very significant consequences in terms of parenting ability.  What we know from research on IQ and parenting is [ ] that once an individual's IQ reaches 60, regardless of how much you provide services to an individual, regardless of how much parenting classes and counseling and supportive services you provide, the individual is not able to.  And of course, her IQ of 65 is above that, but it's -- it's certainly in that range.

What is more significant, perhaps, for day-to-day living is her verbal IQ of 59.  Individuals with an IQ of 59 -- and this is also mirrored if you look under academic achievement with her reading and math skills, which fall generally between a second- and third-grade level.

Individuals with intellectual abilities and reading skills, so forth, at this level very often have difficulty following directions.  They often have difficulty administering medications.  They often have difficulty following anything but the simplest instructions.

They are at risk of being manipulated by others because they misunderstand what people are saying to them or that they're not able to realize when someone is taking advantage of them.

With IQs that are in the range of Mother's, studies suggest that emotional maturity is also delayed.  For instance, individuals with Mother's combination of personality characteristics very often seek out a relationship with a person who

16

will take care of them and will surrender their personal boundaries in return for being taken care of. Such individuals are often prey for individuals who are looking for someone to take advantage of. Foster said that he often saw increased levels of domestic violence with people who tested like Mother.

Based on the testing, Foster concluded that Mother was an individual who was very likely to present as immature, was likely to be emotionally very dependent, was likely to seek out relationships where others would take care of her, was at risk of being manipulated by others, and was likely to have difficulty resolving conflict in a mature manner.

Foster said that Mother's emotions are very likely to influence her decision-making and that her thought processes would be very compromised when she is upset. Foster expected Mother to have "very poor frustration tolerance"; the things most people take in stride, like the challenges of being a parent, would pose more difficulty for Mother. Foster testified that one of the risks to the children as a result of Mother's poor frustration tolerance is inappropriate discipline practices. Foster said that children learn frustration tolerance primarily from their parents and that when such skills are not modeled effectively by parents, the children spend the rest of their lives trying to learn such skills and "very often suffer deficits throughout their lifespan."

Foster testified that it would be detrimental for a child to observe an unhealthy man-and-woman relationship in a household and that a polygamist-type relationship would affect a child's moral development. Foster testified that it is unlikely that Mother would be willing or able to change her relationship status for the benefit of her children.

17

Foster also testified that it would be detrimental to a child to observe domestic abuse and that the way Mother treated Father or Father treated Mother was something that the children would model in their potential future relationships. Children who are raised in homes with domestic violence go between two extremes: (1) there are those who are very angry—acting out and having trouble managing their emotions and dealing with authority figures, as well as their peers and (2) those who become hyper-responsible—walking around on eggshells because they are afraid of setting off a conflict between the parents. Foster testified that children are likely to act out with their siblings physically if there is physical abuse in the household.

Foster said that parents with Mother's characteristics often have a hard time separating themselves from their child's age-appropriate behavior and view a child's spilling his milk as the child trying to punish the parent. Because such parents are unable to separate their emotions from their decision-making, they often make very poor parenting decisions. Foster said that Mother can make parenting choices, but those choices are very often going to be made based on how she feels about the situation instead of the facts or demands of the situation; typically, the child's needs are secondary, which creates a risk for the child. Foster testified that the following were not examples of a parent putting her children's needs first: allowing a child to go to school hungry; repeatedly exposing children to CPS; allowing a child to receive second-degree burns and not seeking medical attention for at least four hours; and failing to eradicate children's head lice for almost two years. Foster agreed that if a child received second-degree burns and if the parent had contacted family members for medical assistance, such act would constitute putting the child first. Foster

similarly agreed that if a child is a picky eater and would not eat but the parent had packed a lunch for the child, such act would constitute putting the child first.

It did not surprise Foster that Mother was unable to keep her children free from head lice for over a year because not being able to follow through is typical for someone with an IQ similar to Mother's. It did surprise Foster that Mother had not rid her children of head lice after instructions were provided thirty or forty times; Foster opined that another dynamic besides intelligence, like Mother's choice to not take care of the problem, had come into play.

Foster testified that people with IQs similar to Mother's typically look on the bright side of things and often fail to learn from experience. When people are overly focused on the positive in their lives, they often do not make needed changes. The fact that Mother had a previous CPS case suggested that she had failed to learn from that experience.

In light of the results from Mother's psychological evaluation, Foster opined that it would create significant risks to return the children to Mother.

### 3. In-Home Parenting Provider's Perspective

#### a. Mop & Glo Incident

Lititia Hickey testified that she had provided in-home parenting services to Mother from July 2010 until January 2011. When Hickey met with Mother, she revealed that H.N.H. had spilled Mop & Glo on herself when she was one. The fact that a child was able to pour a poisonous substance all over her body indicated to Hickey that H.N.H. was not being properly supervised. Hickey testified that an average parent would have attempted to call poison control or

19

another emergency contact when H.N.H. doused herself with Mop & Glo; in Hickey's opinion, it was not reasonable that Mother did nothing.[15]

### b. H.N.H.'s Asthma

Additionally, while H.N.H. was in foster care, CPS asked Mother for H.N.H.'s nebulizer because she had asthma, but Mother refused to provide it. Mother wanted to keep it at her house until the children were returned to her. Hickey did not believe that was appropriate parental behavior.

### c. Relationship with Father and Kimberly and Domestic Violence

Hickey testified that part of the reason that Mother's children were in CPS custody was because of Mother's relationship with Father and Kimberly. Mother said that they were all friends who lived together. Mother thought that her relationship with Father was acceptable, and she had a difficult time trying to separate herself from him because she had been in a relationship with Father since she was very young and because he was the father of her three children. Mother relied heavily on Father, including for rides to her MHMR appointments, and appeared to believe whatever he told her, which Hickey saw as a problem. Mother told Hickey that her children came first, but Hickey did not see evidence of that; Mother continued to have a relationship with Father and Kimberly despite acts of domestic violence. Mother told Hickey that Kimberly had pulled her hair and that Mother had pushed Father when he had tried to break up the fight. Mother also admitted that during one family violence incident, she left a handprint

---

[15]Hickey assumed that Mother did not call poison control after H.N.H. doused herself with Mop & Glo because Mother did not tell her that she had called poison control.

on Father's chest. Police were called to the house, and Mother was given an opportunity to leave the home in lieu of being arrested. Hickey testified that such behavior is not appropriate around children.

### d. Mother's Cognitive Functioning

Mother's cognitive functioning was less than average, which raised concerns regarding her ability to understand what Hickey was trying to teach her.[16] It seemed that most of the time it was hard for Mother to understand what Hickey was trying to do for her. Hickey noted that Mother did not appear to understand that her current housing issue did not help her show stability. Mother told Hickey in January 2011 that she was not sure why CPS had asked her to do "all this stuff." Mother made that statement, showing that she did not understand what CPS was doing, nine months after her children were removed in April 2010. Hickey testified that small children cannot afford a parent who "just can't get it."

### e. Conditions of Homes

When Hickey met with Mother in July 2010, Mother admitted that it was her fault that her children were in CPS custody because she should have kept her home cleaner. Mother's house was dilapidated, had a foul odor, and had a roach infestation. Hickey thought that the foul odor in Mother's house was attributable to the old carpeting. Hickey said that when the old carpeting was removed, the odor was a little better, but there was always an odor in the home. There were three pets living in the house, and there were roaches in the animals' food and water. The pets inhibited Mother's ability to keep the roaches and flies out of the

---

[16]Hickey had observed that Mother could read on a low level but had to ask questions about the words.

house. In August 2010, there were "lots of flies" in the home; Mother explained that was due to leaving the door open while she was giving the dog a bath. Hickey said that it was not an appropriate set of conditions for small children to be living in.

In November 2010, Hickey observed Mother using a gas heater, an electric heater, and the oven to heat the home because there were broken windows that were not allowing the heat to stay in. On several occasions, Hickey noticed that additional windows had been broken out. Mother explained to Hickey that a couple of the windows had been broken during her fight with Father and that a neighbor's motorcycle had "kick[ed] up rocks from the gravel driveway" and broken other windows.

Hickey summarized that Mother had lived in the dilapidated home from July to December 2010. To Hickey's knowledge, no one forced Mother to live in those circumstances. Mother told Hickey that she was going to fix the home and that the rent would be reduced. Hickey saw Mother's father working on the home. Hickey encountered Mother's landlord in November, and the landlord said that Mother owed $40 on her November rent and a full month's rent for December. The landlord then said that she was evicting Mother, Father, and Kimberly because they had not paid their rent and because they had stolen some tools and a lawn mower. Hickey urged Mother to find a better place to live, and Mother moved in with her mother[17] because she did not want to get evicted. Mother called Hickey a month before the termination trial and told her that she had rented a house.

---

[17]Hickey last visited Mother in January when Mother was living with her mother. The home was clean but had roaches.

### f.     Services

As part of the homemaker services program, Hickey concentrated on housekeeping due to all the concerns with the home, but she also went over nutrition and cooking, personal hygiene, budgeting, stress management, home safety, and time management.  Mother worked hard on the initial home and made it a lot cleaner, but the home itself was worn down.  Although Mother initially "was very adamant about getting her house cleaned up.  Toward the end, it appeared that she wasn't doing as much in light of cleaning."  On November 30, Hickey sent caseworker Davis an email that said that Mother loved her kids but that Hickey did not see that Mother had the ability to follow through with her services and gave the impression that she did not really care.

Hickey noted that Mother's behavior initially showed that she was benefitting from the services that Hickey was providing, but at the end of the services, she had not demonstrated that she had "sufficiently benefitted" from the services that Hickey had provided to her.  Hickey said that Mother was still in contact with Father and Kimberly, that Mother was still relying on Father, that she was not implementing the things that Hickey had taught her through in-home parenting and homemaker services, and that the house was still a mess.  So although Mother successfully completed the homemaker services because she had made some improvements, Hickey did not believe that Mother had sufficiently alleviated the risk of abuse or neglect for her children based on what she had learned from Hickey.  Hickey noted that Mother would require a good support system and guidance to assist her with parenting and maintaining her

home. Hickey, however, was unaware of anyone in Mother's family who was willing and capable of supporting her and guiding her.[18]

### 4. Mother's Perspective

#### a. Parenting

Mother testified that her children are ages four, six, and seven. Mother testified that age appropriate behaviors for a seven-year-old child included watching television, hanging out with friends, playing outside, and going to the park; that age appropriate behaviors for a six-year-old child included playing outside, going to the park, and going to a birthday party; and that age appropriate behaviors for a four-year-old child included playing with toys, playing outside, going to the park, watching television, coloring in a coloring book, and having free time.

Mother did not understand the word "vocabulary"; when the question was rephrased, she said that her four-year-old child could say anything, but she did not know whether he could make complete sentences. Mother said that she helped her seven-year-old child with her homework when she was six and that her homework included words like "I," "am," "do," "did," "be," and "may."

With regard to the lice infestation, Mother testified that she had used the lice medicine on H.N.H.'s head and had combed it through her hair but that the medicine did not help. Mother testified that she knew she needed to wash the bed linens and that she had done that. Mother had also been told that she needed to treat the cloth furniture and the carpets for lice.

---

[18]Lopez testified that Mother's parents and sister had a history of involvement with CPS; they had referrals for drug use, the condition of their homes, and sexual abuse. The cases were ruled "reason to believe."

With regard to her children's hygiene issues, Mother disagreed that her children were dirty when they were removed.

### b. Relationship with Father and Kimberly

Mother had been in a relationship with Father since she was sixteen years old, and she was twenty-five years old at the time of the trial. Mother testified that Father was a good father because he "did anything for his children," including giving up the last of his money to buy them food. Mother testified that Father had never made her do anything that she did not want to do.

Mother, Father, and Kimberly lived together for three years while Father and Mother were a couple. During that time, Kimberly had two children with Father, but Mother was not aware that Father and Kimberly were having sexual relations and was told after Kimberly's children were born that they were Father's. Mother testified that she had heard that her children knew that Father slept with Mother one night and with Kimberly one night; Mother said that surprised her because she was not with Father at that time. Mother said that all she knew was that Father slept in the front room. Mother initially believed that her relationship with Father and Kimberly was appropriate for her children, but Mother later agreed that it was not appropriate for her children to see their father living with another woman with whom he was having children. Mother allowed her children to live in that house and continue to see that for two years.

Mother agreed that she never had any CPS issues until Kimberly moved in. Mother said that Kimberly never disciplined or laid a hand on Mother's children when Mother was present, but Mother did not know whether Kimberly whipped Mother's children when Mother was not there. Mother believed that her children were removed because of Kimberly.

25

From the time the CPS investigation started, Mother knew that the living arrangements that she had for her children were not appropriate. Mother did not recall the first time that the Department told her that she needed to separate herself from Father and Kimberly;[19] she agreed that it could have been in April or May 2010. Mother said that she understood that she needed to stay away from Father and Kimberly in order to continue fighting to get her children back, and Mother testified that she would not go around Father or Kimberly. However, Mother agreed that as of February 2011, she was still riding in the car with Father and Kimberly, which was not complying with what the Department had asked her to do.

Mother was in the car with Father and Kimberly in February 2011 when a car accident occurred. Mother admitted that CPS had told her several times that the three of them could not be together. Mother said that was the only time that she had ridden with them and that her mother usually drove her wherever she needed to go.

Mother agreed that she was with Father and Kimberly in March when she saw Davis's supervisor at the grocery store and that she knew that she was not supposed to be with Father and Kimberly. Mother said that she had not spoken to Father and Kimberly "this month," which was April 2011.

Mother was aware that Father had relinquished his parental rights to her three children on the Friday before the termination trial started and that he could no longer have contact with them. Mother testified that she was no longer with

_____

[19]Mother testified at one point that no one told her that she could not be around Father, only that she was not supposed to be around Kimberly.

Father; she had broken up with him "a long time ago." However, Mother admitted that the Friday before the trial, she stood in the courtroom next to Father and Kimberly. Mother, however, had not ridden with them; she had walked to the courthouse.

Mother had a cell phone, and Father and Kimberly were on the contract with Mother. At the time of the termination trial, Mother had not gotten around to having Father and Kimberly removed from the cell phone plan. Mother agreed that if she had taken Father and Kimberly off her cell phone plan, it would have shown the judge that she was serious about not having any more contact with them.

### c. Domestic Violence

Mother testified that the police came out to her home twice because of domestic disturbances. Mother said that one incident was between her and Kimberly and that the other incident did not involve Mother.

Mother said that Kimberly started the fight that occurred in November before Father and Kimberly moved out. Mother could not remember what she said to Kimberly that caused her to become aggressive, but Kimberly responded by calling Mother "a dumb broad." Mother then called Kimberly "a dumb broad" and went to her room. Mother initially told Kimberly "not to lay a hand" on her, or Mother would call the police. Kimberly told Mother that she did not care, and then Kimberly chased Mother into her room, pushed Mother, and pulled her hair. Mother then tried to defend herself. Mother called the police but then tried to cancel the call because "everything just settled down." Before it settled down, Father tried to break up the fight, and Mother pushed him. Father called the police. The police told Mother that she needed to leave because all of the

arguments and fighting were directed at her. Mother believed that the incident constituted physical violence, not family violence.[20]

The second domestic violence call involved an argument between Father's mother and Kimberly, and Kimberly left. Mother was not involved.

### d. Conditions of Houses

Mother did not recall how filthy her home was when Ashley Hambrick, the CPS investigator, came before the children were removed. Mother did not recall Hambrick's telling her that the house had an odor because of the carpet. Mother said that she cleaned her house every day and that she bought bug spray to get rid of the cockroaches.

Mother also tried to make repairs to get the rent reduced, but the landlords did not always help out like they had promised. Mother's landlord Ms. Thorp accused Mother of stealing a lawn mower and some tools. Mother said that Ms. Thorp had asked Kimberly to spray paint the lawn mower silver, and she did. The police investigated, and Kimberly took the lawn mower to the police station. Mother had no convictions for theft at the time of the termination trial.

Mother believed that she had moved four times during this CPS case. Mother did not move every time that she was behind on rent to avoid being evicted, but she did move once or twice to avoid being evicted. Mother agreed that did not show stability.

At the time of the termination trial, Mother had lived in her own home since February 15, 2011, and had signed a lease through July 31, 2011. It was a two-

---

[20]When asked about the fact that her children had reported that Mother and Father threw things at each other, Mother said that she and Father did not do that.

bedroom, one-bath home. The home was in better condition than the other homes that Mother had lived in and did not require repairs. Mother had two beds in each bedroom, couches in the den, and a kitchen table. Mother testified that her home was appropriate.

### e. Services

Mother recalled that her service plan required her to have healthy relationships and to complete anger management classes, homemaking services, and counseling. Mother testified that she had completed all of her services.

Mother completed a healthy relations course through Friends of Family and watched videos about domestic violence.

Mother testified that she had learned in her anger management classes that when she becomes angry, she should take a walk, read a book, listen to the radio, go to the park, go somewhere quiet, or sit on the porch.

Mother testified that she had completed the homemaker class and had learned "a lot" from her parenting classes, including how to keep the stove and refrigerator clean with soap and water. Mother testified that she did not take Barbra Haflich, who coordinated social services for Denton Independent School District, up on her offer to help her with parenting-related issues because she was scared and did not know what to do.[21]

---

[21]Haflich testified that H.N.H.'s school contacted her because H.N.H. was not verbalizing in the classroom and was "a little bit behind" the other kids. Haflich met with Mother and talked about how Haflich could help her, and Mother agreed to meet Haflich at Evers Park Elementary to do individual work on parenting-related issues in a voluntary program. Haflich called Mother a couple of times, but Mother never called her back.

Mother started counseling with Dr. Greer around May 20, 2010, but the counseling did not go well. Mother said that Greer said negative statements to her that made her uncomfortable, but Mother could not recall the negative statements. Mother was still attending counseling with Mark Dittloff at the time of the trial. Mother told Dittloff that she wanted more counseling because she felt like she was learning a lot from him. Mother said that she talked about her children in counseling and about how to develop a support system. Mother said that her support system included her mother, father, and sister, who supported her financially but would not testify because they had prior CPS involvement. Mother's support system did not like Father. Mother had learned during her counseling that her relationship with Father was not good for her. Mother agreed that it had taken time to learn that because she had been with him a long time. Mother had also learned that it was not a good environment for Mother, Father, Kimberly, and Mother's children to be living together.

Mother believed that she had abided by the portion of her service plan that had ordered her not to engage in criminal activity. She said that an argument did not constitute criminal activity and that although the police were called in November when Kimberly attacked her, Mother was not arrested. She said that the police told her to leave, and she agreed to leave in lieu of being arrested.

When Mother was asked whether it was important for a small child to have stability, Mother asked what that was. Stability was explained as a child being able to rely on his mother and father every day, and Mother said that was important. Mother testified that as of the time of the termination trial, she was in a stable home. However, Mother agreed that moving four times did not show her children that her life was stable. Mother understood that the court orders

30

required her to maintain a stable home for at least six months and that she had only been at her new address for two months at the time of the termination trial.

Mother was not required to provide monetary support for her children. Mother bought them clothes, toys, and food totaling $30 each month while they were in CPS's care. Mother said that she gave each child $1.50 at the last visit. Mother agreed that not paying to support her children, in kind or in cash, did not show her children that her life was stable.

Mother completed her psychological evaluation May 25, 2010. Mother testified that her IQ was sixty-five. Mother did not recall that Dr. Foster, who had conducted Mother's psychological exam, recommended that she go to MHMR. Mother said that she went to MHMR on her own because "everyone" was telling her to go.

Mother went to MHMR in September 2010 and was told to return on December 2, 2010. Mother went back to MHMR on December 2, 2010, and told them that she was living with her mother. She said that she spent her days cleaning the house and watching television with her children. Mother was told to come back for a psychological exam to see if she was eligible for services.

Mother underwent the psychological exam on January 10, 2011. Mother received a letter dated January 24, 2011, stating that she had a diagnosis of mental retardation and was eligible for services.[22]

---

[22]The letter in the record actually states that Mother "does not meet the criteria for Mental Retardation Services" and that the decision was made after a face-to-face interview was performed, records were reviewed, and testing was conducted.

Mother underwent a second evaluation in March 2011. Around March 21, 2011, a representative from MHMR came to Mother's house and gave her paperwork with a year-long plan for her.[23] Mother requested services in employment assistance and "home community."

MHMR called to schedule appointments with Mother on days that she already had appointments. Mother told MHMR that she was too busy to have extra appointments because she was attending therapy Tuesdays, Thursdays, and Saturdays every week.[24] Mother testified that she believed that MHMR understood her to say that she was busy all the time. Mother said that not being willing to follow up on her MHMR issues did not show her children that she was stable.

Mother agreed that she needed to demonstrate to CPS that she had learned from her services, and she said that she had shown CPS that she had developed healthy relationships and anger management. Mother testified that she had made positive changes for the benefit of her children in counseling with Dittloff. Mother had also leased a house on her own and was living on her own. Mother said that she was a better parent now because "[p]eople do change" and because she had "learned a lot from then until now."

---

[23]The "Person Directed Plan" states that Mother was uncertain that she needed services; she "just wanted her kids back."

[24]Mother said that she was going to therapy for a car accident that occurred on February 4. Before the accident occurred, Mother attended counseling every two weeks.

### f.    Employment and Income

Mother did not graduate from high school; she dropped out when she was in the eleventh grade because she had a baby.  Mother recalled that she had a one-day job in Lewisville that paid ten dollars an hour.  Other than that, Mother has never worked.  Mother received $674 per month in SSI and $200 in food stamps.  Mother's rent was $550, her electric bill was approximately $97, and her part of the cell phone bill was $50 or $60 per month.

Dea Davis talked to Mother about working on her GED, and Mother enrolled in a GED class in January 2011 and was attending consistently.  Mother was halfway through at the time of the trial, having completed thirty of the sixty required hours.

Mother said that she had "an assistant coach" who was supposed to be helping her get a job.  Mother testified that she was trying to get a job and had applied at Express Personnel but that it had been a long time ago.

### g.    Visits

Mother testified that she visited her children almost every week that she was scheduled for a visitation.  Mother did not miss any visits while they were scheduled in Denton, but she had missed two or three visits after they were moved to Lewisville because Mother lived in Denton and had a hard time finding transportation to Lewisville.  Mother admitted that she had received rides from Father, her mother, and her sister.[25]  Mother missed visits when Father's truck

---

[25]Riding the bus was not an option for Mother; Mother had a fear of riding buses because when she was in ninth grade, she had ridden on a school bus that hit four or five cars and injured several people.

broke down.[26]   During the visits, Mother read books to the children, played with them, colored with them, talked with them, and asked how school was going.

### h.     Mother's Request and Plans

Mother asked the trial court to return her children to her, if not on a permanent basis, at least on a monitored return because she had completed her services and had rented an appropriate home.  Mother wanted to show the court that she could take care of her children without Father and Kimberly.  Mother testified that if her children were returned to her, H.N.H. would attend Tomas Rivera Elementary School, which was down the street from her house, but Mother had not looked into whether her home was in that school's district. Mother also had not looked into daycare for her other two children.

### 5.     Counselor's Perspective

Mark Ditloff, a licensed professional counselor with the Counseling Center of Denton, testified that he began meeting with Mother in October 2010 to help her improve her decision-making.[27]   In order to improve Mother's decision-making, Ditloff talked to Mother about developing a support group made up of people whom she could ask questions about the development of her children and whom she could contact in emergencies.  Mother talked about Father as a

---

[26]Mother agreed that it was not Father's responsibility to transport her to her visits, but she still relied on him for transportation.

[27]Mother attended eleven sessions and missed three; two of the absences occurred when the times and dates were changed, and Mother confused the times.

person that she could turn to,[28] but Ditloff did not see any follow-through from Mother regarding developing a proper support group.

Ditloff went over with Mother the results and recommendations from her psychological evaluation, including whether she understood the findings regarding her IQ. Ditloff thought Mother was confused at times about why CPS was involved in her life; she understood the specifics, but she did not understand why the circumstances led to the children's removal. As they talked, Mother seemed to appreciate the risks that her children had been placed in.

By January 2011, Mother used the counseling sessions for maintenance; she came to the sessions with situations from her life and discussed the decisions that she had made. Although Ditloff heard only Mother's side of the situations, he thought that there were times when Mother had made positive decisions. For instance, Mother went to MHMR to seek employment assistance and had completed most of her service plan. However, Ditloff said that Mother's decision-making did not go in the right direction when it related to dealing with her Court-Appointed Special Advocate worker. Ditloff talked to Mother about how she needed to be able to get along with her CASA worker, but Mother eventually stopped talking with the CASA worker. Other times, Mother delayed finding proper housing, continued to have contact with someone who had put her children at risk, and failed to seek out ways to support her children financially.

The planned topic for the February 8 session was supposed to be Mother's house and how she could make sure that it was appropriate for her children. But

---

[28]Mother had listed Father as her emergency contact when she reported for counseling with Ditloff.

because Mother had been involved in a car accident,[29] the topic shifted to discussing the pain that she was in.

Throughout the counseling sessions, Ditloff never saw Mother interact with her children, so he could not evaluate her parenting skills. Ditloff, however, testified that over time, Mother had developed more thought processes, and getting her children back was "usually the paramount issue in how she chose to make those decisions." Mother also became more comfortable using resources for her situation and was using those resources to help her make better decisions.

Ditloff opined that Mother had tried to improve her decision-making and to deal with and change the situations that had led to the removal of her children. Based on what Mother had told Ditloff, he believed that she had removed the risk that she posed to her children. Ditloff believed that Mother was getting things in place—i.e., a house—so that she would have the opportunity to care for her children, but Ditloff agreed that there was more to caring and protecting children than having a clean house. Ditloff testified that Mother needed more counseling and that Mother wanted more counseling.

### 6. CASA Volunteer's Perspective

#### a. Condition of Homes

Andrea Calloway, a CASA volunteer who was assigned to the case in April 2010, met with Father's mother and learned that the condition that the children were in at the time of the removal was a normal occurrence for them. Calloway

---

[29]Ditloff was not aware that Mother was with Father during the car accident.

first visited Mother's home on Mockingbird Street on May 21, 2010. When she walked into Mother's house, she detected a "really bad odor" that "smelled a lot like dog and smoke and just a combination of things." The living room was "picked up," but the carpeting was very, very dirty and soiled. The kitchen "looked pretty decent." One of the bedrooms was filled with Kimberly's belongings, another room had pallets on the floor and either a twin bed or futon, and the master bedroom contained a king-sized bed and a twin mattress propped against the wall.

Calloway visited Mother's second home and found that it was worse than the one on Mockingbird. Calloway said that the odor "was far worse" and that the boys' bedroom had a "very, very powerful" urine odor that made Calloway "a little ill." Mother told Calloway that they had a dog, but that did not explain all the odors; Calloway told Mother that she needed to rip out the carpet and sanitize the room. Calloway observed roaches and other bugs in the homes and testified that those kinds of pests carry diseases and create a risk of physical harm for children.

Calloway testified that Mother had reached agreements with most of her landlords that she would perform repairs on the homes in exchange for lowered rent, but Mother did not complete the repairs and was subjected to eviction. Three or four times during the case, Calloway offered to take Mother apartment hunting or house hunting, but Mother would not go because she would not be able to stay with Kimberly and Father.

With regard to the home Mother rented before the termination trial, Calloway said that it was appropriate. Calloway had spoken with Mother's landlord who said that Mother had signed a six-month lease. Calloway, however,

did not believe that Mother would be able to maintain her home because her disability income barely covered the rent. Calloway said that Mother, Kim, and Father with their combined income of $3,000 could not pay their bills without the children in the house, so CASA was concerned how Mother could provide for three children on $674.[30]

In her report, Calloway noted that "CASA questions [Mother's] ability to maintain a safe and suitable home for her children." Calloway explained that CASA's concern was that Mother went from one place to another four times during the case and that the places were not appropriate for the children because the houses were in very poor condition and were "very, very dirty." Calloway testified that the instability in housing created emotional harm for the children and that she believed that Mother's children had fears regarding their permanent and forever home.

### b. Relationship with Father and Kimberly, Anger Management, and Domestic Violence

Calloway testified that Mother did not regard her relationship with Kimberly and Father as unusual; Mother did not see anything wrong with it. But Calloway disapproved of the sexual relationship that Father had with Kimberly and Mother while the children were living there. Calloway said that when women are being shared by a man, it creates a very chaotic and violent environment. She said, "There's so much competition between the two women for the affections of this

---

[30]Calloway noted in her report that CASA had grave concerns about Mother's ability to manage her money effectively. Calloway learned that Father was the payee on Mother's SSI card, but Calloway did not know whether Father was still controlling Mother's finances at the time of the termination trial.

man that the children get pushed aside and neglected, and it's hard on them emotionally."

Calloway talked to Mother about anger management when Mother became upset after Father had abandoned her at the CPS office in June and told her that he did not want her anymore. Calloway took Mother home, told her that she needed to get away from Father and Kimberly, and offered her help to do that. Calloway later went back to the home on Mockingbird to perform an unannounced visit and saw Mother, Father, and Kimberly leaving together.

After Mother completed anger management in June or July 2010, there was another incident of domestic violence in August 2010, which indicated to Calloway that Mother had not learned anything in her anger management class. Mother called Calloway on November 7, 2010, which was the day after one of the domestic violence incidents. Mother told Calloway that the previous night, Father had kicked her out, had pulled her hair, had kicked down the door, had broken a window, and had punched a hole in the wall, and the police were called.

Calloway was concerned about the family violence between Father, Kimberly, and Mother, which occurred more often than just the two domestic disturbances that the police responded to. The children told Calloway that there was "a lot of screaming and yelling, throwing things, [and] hitting" and that it scared them. Calloway testified that family violence in the home created a risk of physical or emotional abuse for the children and that the children were at risk of physical or emotional harm whenever they saw family violence in the home. Calloway was also worried about the children's health and safety because Kimberly had proven to be violent with children and that she sometimes cared for Mother's children.

39

Calloway said that the relationships the children observed in the home affected their future development as young men and women because the children mimicked the behaviors demonstrated by the adults, who served as the children's role models; it also affected the way that the children perceived how they should treat members of the opposite sex. Calloway testified that she believed that the type of behavior that the family engaged in was harmful for the children and was not appropriate.

Although Mother had not lived with Father and Kimberly since December 2010, Calloway did not believe that Mother had ended her relationship with Father. Calloway had received information from CPS that Mother had been seen with Father and Kimberly since Mother had moved into her own home. Calloway was also aware that Mother was with Father as recently as the Friday afternoon prior to the termination trial. Thus, Calloway had not seen anything that would indicate to her that Mother, Father, or Kimberly had alleviated the risk of harm to the children.

### c.    Support System

Calloway interviewed Mother's extended family and did not believe that they would be sufficient to support Mother and her three children; Calloway said that "[t]heir heart is in the right place, but they're afraid of [Father]" and that they were raising some of their other grandchildren. Early in the case, Mother rejected joint custody with a paternal aunt and uncle who were willing to help her manage her money and maintain a home; Calloway said that Mother did not give a reason for not wanting to move to San Antonio to take advantage of their help. Calloway further testified that she knew that the aunt had kidney problems and that this was a concern with CPS as far as placement.

40

### d. Services

Calloway talked to Mother about her services and told her that it was very important to complete all of her services. Calloway told Mother that it was not enough to "just check the boxes"; CASA expected to see a significant change in her lifestyle and behaviors in order for a recommendation to be made that her children should be returned to her.[31] Calloway said that it does a parent no good to work the services if she does not learn anything.

Mother completed First Step, but Calloway did not believe that Mother had benefitted from the program. Calloway testified that after Mother had completed the program, "the home got worse"; there was even more damage to the home due to domestic violence (i.e., windows were broken out), and the home was dirty (i.e., the floors were covered in grit such that Calloway made a "crunch" noise walking across the floor).

A referral was made for Mother to attend Denton County Friends of the Family so that Mother would extricate herself from Father and Kimberly. Mother did not benefit from that service, and her participation did not sufficiently alleviate the risk of abuse to her children.

Mother had not refrained from engaging in criminal activity; she had engaged in domestic violence in November 2010. Calloway, however, was not aware that Mother had walked away from Kimberly, nor was Calloway aware that Mother had to use self-defense to get out of the situation.

---

[31]Calloway admitted that the court-ordered service plan did not require Mother to benefit from the services, only to complete them.

At the temporary hearing, the Department did not ask Mother to pay money in child support because they believed that would be setting her up to fail. The Department, instead, requested that Mother provide in-kind support. Calloway observed that Mother usually brought food to the visits and that during the visits that occurred near the children's birthdays, Mother brought some clothing and toys. Calloway did not believe that the support Mother had provided for the children was "anywhere close to remotely adequate to support three children," nor did she believe that Mother had done her best to support her children while they were in CPS's care.

Calloway summarized that Mother had completed anger management classes, a healthy relations class through Friends of the Family, a psychological examination, and homemaker classes; had not been convicted of a crime; had appropriate visits with her children; and had participated in counseling through MHMR. Mother had not lived in her home for six months as required under the plan, but her home at the time of the termination trial was suitable.

### e. CASA's Recommendation and Plan

Calloway did not believe that Mother could appropriately parent her children. As a result, Calloway asked the trial court to terminate Mother's parental rights to her three children because CASA believed it was in the children's best interest.[32]

---

[32]Calloway noted that the children were in a foster home with parents who were willing to adopt them.

### 7. Attorney Ad Litem's Perspective

The attorney ad litem for the children testified that

this case is really unfortunate because I don't think [Mother] is a bad person at all. I have no doubt she loves her kids. My concern, though, is for -- is her ability to properly care for and protect her kids. And all we have to go by is the track record.

I kept listening for something that would assure me so I could assure the court that that she could properly care for her kids. I haven't been able to find one. And we have the Spic and Span incident [sic] and we had the 2008 burn incident and we had the January referral and then the March removal.

And I heard her saying that she was blaming [Kimberly] for the removal of her kids, but that's just not the case. We heard her testify the kids weren't dirty when they were removed, and we all know that's not true.

And I do have to say that I admire her for being here, representing herself. I mean, everybody else has abandoned her but she's here, and I admire that about her. But -- and I kept looking for every alternative to termination, but I haven't been able to find it. So for the safety of the kids, I would have to join with CASA and CPS and recommend termination.

### F. Trial Court's Disposition

After hearing the above testimony, the trial court found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, that Mother had engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered the physical or emotional well-being of the children, and that

termination of the parent-child relationship between Mother and H.N.H.; J.L.H., Jr.; and J.N.H. was in the children's best interest.[33]

## III. LEGALLY SUFFICIENT EVIDENCE TO SUPPORT ENDANGERMENT FINDINGS

In her first, second, fourth, fifth, seventh, and eighth points, Mother argues that there is legally insufficient evidence to establish the termination grounds under family code section 161.001(1)(D) and (E) for each of her three children. The Department argues that there was ample evidence to support the trial court's conduct and environment findings because the trial court was entitled to find that Mother endangered her three children by failing to maintain safe and stable housing, by participating in domestic violence, by engaging in and continuing inappropriate relationships, by failing to adequately and appropriately care for her children by herself, and by failing to establish a support system to assist her.

### A. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed

---

[33]The trial court also terminated Father's parental rights to H.N.H.; J.L.H., Jr.; and J.N.H., but Father did not appeal.

merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

## B. Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that Mother knowingly placed or allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part*, 243 S.W.3d 611 (Tex. 2007). Subsection (D) focuses on the suitability of the children's living conditions. *J.A.J.*, 225 S.W.3d at 626. Thus, under subsection (D), it must be the environment itself that causes the children's physical or emotional well-being to be endangered, not the parent's conduct. *Id.* at 627.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727

47

S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's births. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### C. Evidence Is Legally Sufficient to Support Endangerment Findings

In determining whether the evidence is legally sufficient to support termination of Mother's parental rights pursuant to subsection (D) or (E), we look at whether Mother (1) knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being or (2) engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). The Department's brief focuses on the following acts or omissions by Mother that it contends support termination of Mother's rights under (D) and (E): failing to maintain safe and stable housing, participating in domestic violence, engaging in and continuing inappropriate relationships, failing to adequately and appropriately care for her children by herself, and failing to establish a support system to assist

48

her. We will examine all of the evidence in the record, focusing on these allegations.

The places that Mother chose for her family to live exhibited unsafe living conditions for children. The homes had roaches, flies, terrible odors, and broken windows that made heating difficult. Rotten food was also found left out in the kitchen at one of the houses. This is some evidence that Mother knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See In re K.M.B.*, 91 S.W.3d 18, 24–25 (Tex. App.—Fort Worth 2002, no pet.) (holding that evidence that Mother exposed children to homes with roaches and lice problems, animal feces, terrible odors, and general filth supported environmental endangerment finding).

Additionally, the record demonstrates that the children had witnessed domestic violence and inappropriate relationships. The children lived in a house with three adults and witnessed the three adults screaming, yelling, hitting, and throwing things. The CASA volunteer testified that this behavior scared the children, and CPS was concerned that one of the children could be injured. The record contains evidence that Mother had used a toy truck to hit one of Kimberly's children and had spanked her children and Kimberly's children with a belt. Although there is no evidence that Mother physically abused her own children, Mother often allowed Kimberly to watch Mother's children, and Kimberly admitted to causing the injuries on her child that led to the removal of all of the

49

children in the house. Moreover, the children knew that Father slept with Mother some nights and with Kimberly some nights; yet, Mother did not seem to understand the impropriety of the living arrangements—even after CPS's repeated warnings—and continued to live with Father and Kimberly for approximately eight months after Mother's children were removed. Mother also continued to associate with Father and Kimberly up until a month before the termination trial and had not removed them from her cell phone plan at the time of the termination trial. This is some evidence that Mother's conduct, as well as the conduct of those she exposed her children to, endangered them. *See In re M.R.,* 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing a child to domestic violence supports an endangerment finding).

The record also demonstrates that Mother was unable to adequately provide for her children. Mother had virtually no employment history and had only recently worked towards obtaining her GED. Mother depended on Father and Kimberly to help provide her and her children with basic necessities, including food and housing. Mother brought in-kind support in the form of food and gifts to the visits, but Calloway did not believe that the support Mother had provided for the children was "anywhere close to remotely adequate to support three children." Nor did Calloway believe that Mother had done her best to support her children while they were in CPS care. After living at four different residences during the time the case was pending, Mother rented her own home

approximately two months before the termination trial. But the record revealed that Mother's finances would make it almost impossible for her to continue to live there and that the children had fears regarding their permanent and forever home. This is some evidence that Mother's conduct, including omissions, endangered her children's physical or emotional well-being and that Mother exposed her children to an unstable environment that endangered her children's physical or emotional well-being. *See In re T.C.*, No. 10-10-00207-CV, 2010 WL 4983512, at *4–5 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (holding that although there were recent developments that showed improvements in mother's stability, the trial court could reasonably have determined that any evidence of improvement was short-lived and outweighed by the extent of her prior history; thus, the evidence supported that mother, by living in fifteen locations among other things, had engaged in conduct that endangered the child's physical and emotional well-being).

The record also demonstrates that Mother was unable to properly care for her children. Mother did not seek treatment for H.N.H. when she received second-degree burns. After a concerned relative called in a referral, police responded and immediately called EMS. The four-hour delay that occurred before H.N.H. received treatment for second-degree burns, which required an overnight hospital stay, was "pretty significant." The record also contains no evidence that Mother sought treatment for H.N.H. when she poured Mop & Glo on herself at age one. Mother failed to get up in time to feed H.N.H. before she

went to school, which resulted in stomachaches and which the record revealed could harm H.N.H.'s physical and emotional development. Mother failed to treat H.N.H.'s asthma, and all of the children were dirty. Due to Mother's verbal IQ, the record revealed that she was likely to have trouble following directions, like those for asthma and lice medication, which created significant risks to her children. Moreover, the record is replete with evidence that Mother had failed to properly treat and eradicate lice in her children's hair for approximately two years. Furthermore, Mother failed to establish a proper support system to help her care for her children. This is some evidence that Mother's conduct, including omissions, endangered the children's physical or emotional well-being. *See In re S.H.A.,* 728 S.W.2d 73, 87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (holding that evidence that parents did not properly feed child and did not seek appropriate medical treatment for child was some evidence to support jury's findings that parents had engaged in conduct which endangered child's physical or emotional well-being).

Viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that some evidence exists that will support a factfinder's firm conviction or belief that Mother violated subsections (D) and (E). We thus hold that the evidence is legally sufficient to support termination of Mother's parental rights to H.N.H.; J.L.H., Jr.; and J.N.H. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *K.M.B.,* 91 S.W.3d at 24–25

(holding evidence legally sufficient to support trial court's 161.001(1)(D) finding because evidence showed that Mother exposed children to homes with roaches and lice problems, animal feces, terrible odors, and general filth); *In re S.K.*, 198 S.W.3d 899, 906–07 (Tex. App.—Dallas 2006, pet. denied) (holding evidence legally sufficient to support trial court's 161.001(1)(E)[34] finding because evidence showed that children were dirty regularly and often had lice, that parents exhibited limited parenting skills and did not understand issues involved in children's developmental needs, and that CPS had seen no changes in parents' pattern of behavior through course of case); *see also In re Z.A.S.*, No. 02-11-00040-CV, 2011 WL 3795231, at *15–16 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that Mother, among other things, had moved frequently, had limited employment, and had chosen homes with unsafe living conditions for children); *In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *39–41 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that Mother, among other things, had failed to seek medical treatment for child, had moved

---

[34]Although the *S.K.* opinion cites section 161.001(1)(D), it is clear from the context—which states that "Mother engaged in conduct and Father knowingly placed the children with a person who engaged in conduct which endangered the physical or emotional well-being of [the children]"—that section 161.001(1)(E) is the subsection that was intended.

frequently, had limited employment, and had exposed her children to domestic violence); *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's 161.001(1)(D) and (E) findings because evidence showed that father had engaged in conduct that subjected his children to a life of instability and uncertainty, including living at more than five residences over five years and living in residences that were "genuinely dirty" and in disarray; had used illegal drugs; had engaged in domestic violence; and had exhibited anger issues).[35]

We therefore overrule Mother's first, second, fourth, fifth, seventh, and eighth points. Because termination based on one subsection of section 161.001(1) will support termination, we need not address Mother's third, sixth, and ninth points challenging the termination of her parental rights based on section 161.001(1)(O). *See* Tex. Fam. Code Ann. § 161.001(1); Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to final disposition of the appeal).

## IV. CONCLUSION

---

[35]Although Mother claims that the evidence is insufficient to support the termination of her parental rights to J.L.H., Jr. and J.N.H. because "there is virtually no mention of [them] throughout the entire proceedings," Mother's argument fails because all of the children were exposed to the unstable and unsafe living conditions, domestic violence, and lice.

Having disposed of every point necessary for final disposition of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to H.N.H.; J.L.H., Jr.; and J.N.H.

SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: January 12, 2012